**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| SAURAV SHARMA, DIANE YOUNG, JAIME STIEVE, and GEORGE DEAN, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br> v. <br><br> VISIONWORKS OF AMERICA, INC., <br><br> Defendant. | Case No.: <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiffs Saurav Sharma, Diane Young, Jaime Stieve, and George Dean (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Visionworks of America, Inc. (the "Defendant" or Visionworks"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.     Visionworks controls and operates Visionworks.com (the "Website" or "Visionworks Website"). On the Website, users can buy prescription eye products (the "Rx Users"), schedule eye examinations (the "Examinees"), and browse sensitive health-related articles (the "Browsers" and collectively with the Rx Users and Examinees, the "Tracked Users"). The Website offers the option for Tracked Users to search for products and health related information which can be purchased from local Visionworks store locations or purchased and delivered directly to the Tracked User.

2.      To use the Website's search function (the "Search Bar"), Tracked Users type search queries or search terms (the "Queries") into the Search Bar.  The Search Bar is used to search for specific information and goods on the Website.  After typing and submitting Queries into the Search Bar, results are obtained from the Website and displayed as a list to its Tracked Users.

3.      Unbeknownst to Tracked Users, Visionworks employs tracking tools on the Website which intercept communications between Tracked Users and the Website.  Meta's Pixel (the "Pixel" or "Facebook Pixel" or "Meta Pixel") is a tracking tool which was created by Meta (also referred to as "Facebook" or the "Tracking Entity") to send the Tracking Entity information relating to Tracked Users' searches and activity on any website that installed it, including the Visionworks Website.

4.      Further, when Tracked Users click on specific items on the Website, detailed descriptions of each item are shared with the Tracking Entity, including details about health articles, scheduled eye exams, and prescription products.

5.      By sharing the health-related data that Tracked Users search for, browse, and add to cart, Defendant shares protected private health information ("PHI") with the Tracking Entity.[1]

6.      The Website does not provide Tracked Users with notice that the Website's use of a Search Bar would cause their Queries to be shared with the Tracking Entity, that viewing items will result in detailed information about those items being intercepted by the Tracking Entity, or

---

[1] For example, Tracked Users may reveal a variety of eye health information by using the Website to search for information on eye health conditions (*i.e.*, astigmatism) and scheduling eye exams in specific geographic locations.

that such interceptions will be used to benefit the Defendant and Tracking Entity separate from the services being rendered to the Tracked User.[2]

7.    Visionworks does not obtain Tracked Users' consent to its disclosure practices prior to Tracked Users' use of the Website.

8.    Tracking tools, such as the Meta Pixel, improve the value of advertising by collecting and analyzing Tracked User data to determine interests, lifestyles, demographics, and other relevant categorizations to ensure relevant ads reach Tracked Users.  This value can be monetized by using this information to sell advertising across multiple websites to marketing firms looking to target Tracked Users based on their use of the Website or demographics.

9.    In effect, the Tracking Entity receives a benefit, independent of the benefit conferred on Defendant, by using the information it obtains through tracking Tracked Users' interactions on the Website to increase the value of the advertising it sells to various other parties.

10.    A data sharing policy for a website or online store is an important factor for individuals deciding whether to provide personal information to that website.

11.    Federal, Texas, and Pennsylvania legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

12.    Congress passed the federal Wiretap Act ("ECPA"), which prohibits the unauthorized interception of electronic communications.

13.    Texas passed its Wiretap Act (the "Texas Wiretap Act"), which attaches liability to the interception or recording of any wire, oral or electronic communication, absent consent of at

---

[2] Interception of Tracked Users' communications with Defendant's Website will also be used outside of the Website by Tracking Entity to target Tracked Users with advertising sold to advertising purchasers, as discussed, *infra*, in ¶¶ 53-57.

least one party. intercept or record any wire, oral or electronic communication without the consent of at least one party.[3]

14.    Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S. § 5701 *et seq*. "prohibits the interception of wire, electronic, or oral communications, which means it is unlawful to acquire those communications using a device."[4]

15.    Visionworks purposefully implemented and utilized various tracking tools on its Website, including the Meta Pixel.

16.    The Website does not obtain consent to share Tracked Users' Queries with third parties contemporaneously with Tracked Users' search requests.

17.    Nor does the Website obtain consent from Tracked Users when it shares with Meta their attempts to schedule doctor appointments.

18.    Visionworks knew that the search feature used on the Website would gather and share Tracked Users' Queries, Website browsing, and Website activity to the Tracking Entity, and that the Website did not provide notice of or obtain consent as to such practices.

19.    Thus, Tracked Users have been harmed by Visionworks, resulting in violations of the ECPA, WESCA, the Texas Wiretap Act.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Visionworks to immediately (i) remove the tracking tools from the Website, or (ii) add appropriate and conspicuous disclosures about the nature of its Search Bar and obtain the appropriate consent from Tracked Users.

20.    Plaintiffs also had their privacy interests violated.

---

[3] Texas Penal Code § 16.02.
[4] *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 124 (3d Cir. 2022).

21.     Tracked Users of the Website, such as Plaintiffs, have an interest in maintaining control over their private and sensitive information, such as their Queries, as well as an interest in preventing their misuse.

22.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of Tracked Users for violations of the ECPA, WESCA, Texas Wiretap Act, breach of contract, breach of implied contract, and intrusion upon seclusion.

23.     Defendant violated the Tracked Users' privacy interests the moment, and each time, Plaintiffs and Tracked Users entered and submitted Queries via the Website's Search Bar, clicked on individual products within the Website, and added those products to their digital shopping cart, each of which independently resulted in PHI being intercepted by the Meta Pixel.

## PARTIES

24.     Plaintiff Saurav Sharma is a resident of High Point, North Carolina. Over the past two years, Mr. Sharma visited Defendant's Website, including in early 2022 to book a doctor appointment.[5] During his visits to the Website, Mr. Sharma was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Sharma visited Defendant's Website to search for products and information, and to schedule an appointment with a doctor, resulting in Mr. Sharma's PHI being shared with Facebook. After completing an eye exam, Mr. Sharma browsed the Website's selection of prescription products, resulting in his PHI being shared with Facebook. Mr. Sharma's Facebook

---

[5] Plaintiffs can provide additional, sensitive details about their doctor visits, and any services or products searched for obtained.

profile included personally identifiable information, including his real name, personal photos, and gender. Mr. Sharma did not consent to Defendant collecting his data while visiting and using the Website.

25.    Plaintiff Diane Young is a resident of Lansdowne, Pennsylvania. For the past several years, Ms. Young visited Defendant's Website, including in late 2022 to book a doctor appointment. During her visits to the Website, Ms. Young was not provided an opportunity to review or consent to share her personal information, or consent to the use of the tracking tools, or to the sharing of any of her personal information such as her statutorily protected health information. Ms. Young has used the Website search function to search for and schedule an appointment with an optometrist, as recently as November 2022, as well as searching the Website on a number of occasions for prescription products, resulting in Ms. Young's PHI being shared with Facebook. Ms. Young's Facebook profile included personally identifiable information, including her real name, personal photos, and gender. Ms. Young did not consent to Defendant collecting her data while visiting and using the Website.

26.    Plaintiff Jamie Stieve is a resident of Elizabethtown, Kentucky. Over the past several years, Ms. Stieve visited Defendant's Website at various times, including in early 2022 and early 2023 to book doctor appointments, as well as in December 2023 to use Visionworks "Try On" feature. During her visits to the Website, Ms. Stieve was not provided an opportunity to review or consent to share her personal information, or consent to the use of the tracking tools, or to the sharing of any of her personal information such as her statutorily protected health information. Ms. Stieve visited Defendant's Website utilizing Defendant's Website search function, including to search for and schedule an appointment with a doctor, and to upload an image of her face to use Visionworks virtual lens fitting program, resulting in Ms. Stieve's PHI

being shared with Facebook. Ms. Stieve Facebook profile included personally identifiable information, including her real name, personal photos, and gender. Ms. Stieve did not consent to Defendant collecting her data while visiting and using the Website.

27.     Plaintiff George Dean is a resident of Rome, Georgia. Over the past several years, Mr. Dean visited Defendant's Website at various times, including in July 2020 to book a doctor's appointment. During his visits to the Website, Mr. Dean was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Dean visited Defendant's Website utilizing Defendant's Website search function, including to search for and schedule an appointment with a doctor, resulting in Mr. Deans' PHI being shared with Facebook. Mr. Dean's Facebook profile included personally identifiable information, including his real name, personal photos, and gender. Ms. Dean did not consent to Defendant collecting his data while visiting and using the Website.

28.     Defendant Visionworks is incorporated in Texas and headquartered in San Antonio, Texas. Visionworks operates a website and a chain of physical stores in the United States,[6] which perform eye examinations and sell prescription and non-prescription glasses, contact lenses, and sunglasses, backed by "a network of Optometrists and technicians . . . ready to fulfill vision prescription needs . . . ."[7]

---

[6] Visionworks has physical locations in: Arizona, California, Colorado, Delaware, Washington D.C., Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.
[7] *About Us*, VISIONWORKS https://www.visionworks.com/about-us?_ga=2.235260289.1864664553.1708213718-1274734943.1707415629 (last visited February 23, 2024).

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from Defendant.

30.     This Court has personal jurisdiction over Visionworks because Visionworks is headquartered and incorporated in the State of Texas, and derives revenue in the State of Texas, including Visionworks' revenue generation from its Website, and physical Visionworks locations throughout the state of Texas. Further, the harms suffered by Plaintiffs occurred, in part, in Texas as Visionworks chose to add the tracking software on their webpages in Texas.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Visionworks has places of business located in this District and Visionworks conducts substantial business operations in this District.

## COMMON FACTUAL ALLEGATIONS

### A.     Legislative Background

#### 1.     Electronic Communications Privacy Act ("ECPA")

32.     The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[8]

---

[8] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, WASHINGTON AND LEE JOURNAL OF CIVIL RIGHTS AND SOCIAL JUSTICE, *available at* https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited February 23, 2024).

33.    The Wiretap Act primarily concerned the government's use of wiretaps but was amended in 1986, through the Electronic Communications Privacy Act ("ECPA"), to provide a private right of action for private intrusions as though they were government intrusions.[9]

34.    Congress was concerned that technological advancements were rendering the Wiretap Act out-of-date, such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing."[10]

35.    As a result, the ECPA primarily focused on two types of computer services which were prominent in the 1980s: (i) electronic communications such as email between users; and (ii) remote computing services such as cloud storage or third party processing of data and files.[11]

36.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication;[12] (iii) while the communication is being transmitted on that service (the "contemporaneous requirement")[13]; (iv) to any person or entity other than the intended recipient of such communication (the "party exception").[14]

37.    However, the party exception does not apply to a party that intercepts or causes interception if the "communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State." 18 USCS § 2511(2)(d).

---

[9] *Id.* at 192.
[10] Senate Rep. No. 99-541, at 2 (1986).
[11] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).
[12] 18 USCS § 2511(1).
[13] 18 USCS § 2511(3)(a).
[14] 18 USCS § 2511(2)(d).

### 2.    Health Insurance Portability and Accountability Act ("HIPAA")

38.    HIPAA, Public Law 104-191, was enacted on August 21, 1996, in part to regulate how individually identifiable health information was handled.[15] HIPAA requires the Secretary of U.S. Department of Health and Human Services ("HHS") to issue privacy regulations governing individually identifiable health information within three years of the passage of HIPAA, if Congress did not enact privacy legislation.[16] Because Congress did not enact any legislation, HHS proposed its Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rule"), release it for public comment, and the Privacy Rule was finalized and published on December 28, 2000.[17]

39.    HIPAA applies to "covered entities" which is defined as: (1) a health plan; (2) a health care clearinghouse; or (3) a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. 45 CFR §160.103.

40.    HIPAA protects individually identifiable health information ("PHI"), where that information identifies the individual or there is a reasonable basis to believe the information can be used to identify the individual, and reveals (1) past, present, or future physical or mental health or condition of an individual; (2) the provision of health care to an individual; or (3) the past, present, or future payment for the provision of health to an individual. 45 CFR §160.103.

---

[15] *Health Information Privacy: Summary of the HIPAA Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html#:~:text=The%20Health%20Insurance%20Portability%20and%20Accountability%20Act%20of%201996%20(HIPAA,and%20security%20of%20health%20information (last visited February 23, 2024).
[16] *Id.*
[17] *Id.*

41.    On December 1, 2022, the HHS Office for Civil Rights issued a bulleting "to highlight the obligations of . . . HIPAA . . . on covered entities . . . under the HIPAA Rules . . . when using online tracking technologies."[18]

42.    HHS specified that "[t]hese online tracking technologies, like . . . [the] Meta Pixel, collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application." [19]

43.    HHS notes that information shared to tracking technology vendors, such as:

> "an individual's . . . home or email address, or dates of appointments, as well as an individual's IP address or geographic location, . . . or any unique identifying code . . . generally [qualifies as] PHI, even if the individual does not have an existing relationship with the regulated entity and even if the [PHI], such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because when a regulated entity collects the individual's [PHI] through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care."[20]

44.    This applies to "authenticated webpages, which require a user to log in before they are able to access the webpage," and even to some "unauthenticated webpages, which are webpages that do not require users to login before they are able to access the webpage."[21]

45.    Notably, where "[t]racking technologies on a regulated entity's unauthenticated webpage . . . addresses specific symptoms or health conditions, such as pregnancy or miscarriage,

---

[18] *HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Dec. 1, 2022) https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html (last visited February 23, 2024).
[19] *Id*.
[20] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited February 23, 2024).
[21] *Id*.

or [unauthenticated webpage] permits individuals to search for doctors or schedule appointments[,]" the tracking technology vendors would have "access to PHI[.]"[22]

**B.**     **How Websites (and the Internet) Operate**

46.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers, but websites "run" on a user's internet browser.

47.     Websites are a collection of webpages, and each webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[23]

48.     Webpages each have a unique address, and two webpages cannot be stored at the same address.[24]

49.     When a user navigates to a webpage, by either entering a URL address directly or clicking a hyperlink containing the address, the browser contacts the DNS server, which translates the web address of that website into an IP address.[25]

50.     An IP (Internet Protocol) address is "a unique address that identifies a device on the internet . . . ."[26] An IP address is:

> …the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[27]

---

[22] *Id.*

[23] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited February 23, 2024).

[24] *Id.*

[25] *How the web works*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited February 23, 2024).

[26] *What is an IP Address – Definition and Explanation*, KASPERSKY https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited February 23, 2024).

[27] *Id.*

51.     The subscriber's browser then sends an HTTP Request to the server hosting that IP address via specific Request URL, requesting a copy of the webpage data for that Request URL be sent to the user, which, if approved, causes the server to send a HTTP Response that authorizes the HTTP Request and begins the process of sending the webpage's files to the user in small chunks.[28]

52.     This Request URL includes a domain name and path, which identify the content being accessed on a website and where it is located.

53.     The Request URL typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters (described more fully in Section E(2)(iii)).  Parameters direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 1 - Mozilla's diagram of a URL, highlighting the different elements of a URL and how they appear [29]*

54.     The subscriber's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[30]

**C.      Plaintiffs Have a Privacy Right in Their Use of the Visionworks Website**

55.     Companies can easily build profiles of customers based on their consumer habits.

---

[28] *Id.*
[29] *What is a URL?*, MOZILLA, *available at* https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on February 23, 2024).
[30] *Id.*

56.     Communications shared between consumers and companies, by and through their websites and mobile apps, appear to be private but, in reality, the contents of those messages are regularly, without notice, shared with third parties.

57.     Here, Visionworks shares users' information, including Queries, with the Tracking Entity.

58.     Queries are inherently private.   This is particularly true when the searches are communicated in confidence or presumed to be private.   While all Queries are personal in nature, there is an obviously heightened want for the searches to be kept confidential when the Queries themselves contain private health information.

59.     Descriptions and summaries of medical products, scheduled medical appointments, and Queries relating to such are private information, indicating the health status and concerns of users, information which is federally protected, which Visionworks candidly admits.[31]

60.     Tracked Users search for, look at, and purchase medical products from the Website using Queries, by viewing medical product webpages, and adding those medical products to their cart.   The Queries, when associated with descriptions of the products, pertain to more than users' basic privacy.

61.     Similarly, Tracked Users can navigate the Website to schedule eye examinations, as well as search for eye health information. Tracked Users' health statuses are highly personal, as is their choice to examine and manage health issues.

62.     These descriptions and summaries of prescription products, Queries, eye examination scheduling, and eye health information (collectively "private health information" or PHI) is then shared with various advertising services, including Meta.

---

[31] *See Notice of Privacy Practices,* VISIONWORKS  https://vsp.widen.net/s/hdhqsccwlq/notice-of-privacy-practices (last visited February 23, 2024).

**D.    Visionworks Is a Covered Entity and Plaintiffs' Information Constitutes PHI**

64.    Visionworks declares itself as a covered entity pursuant to HIPAA.[32]

65.    Visionworks' Notice of Privacy Practices notes that it follows "federal and state laws concerning protected health information" because it is "required by applicable federal and state law to maintain the privacy of your protected health information."[33]

66.    While a brick-and-mortar store may more effectively separate its optometry and normal business in a physical space, the lines are blurred for online stores.

67.    Notably, products one would expect to find in the optometry section of a store are found by navigating the normal portions of the Website.

**E.    The Tracking Entity Utilizes Tracking Tools to Benefit From Gathering Tracked Users' Information**

68.    As described in Section G, the Website does not notify Tracked Users that their Queries will be surreptitiously intercepted when conducting a search on the Website. There is no conspicuous notice near the Search Bar that would let Tracked Users know that their searches were being tracked, stored, and shared.

69.    The Website's use of the Tracking Entity's tracking tools in Visionworks' implementation of the Search Bar provides benefits to the Tracking Entity that is independent of the benefit conferred to the Website.

**1.    Visionworks and Meta Benefit From Disclosing Plaintiffs' PHI**

70.    Meta largely makes its revenue from selling advertising.[34]

---

[32] *See Visionworks Online Privacy Policy*, VISIONWORKS *https://www.visionworks.com/privacy-policy (last visited* February 23, 2024) (noting its normal privacy policy does not "supersede or replace our HIPAA Privacy Notice")
[33] *Notice of Privacy Practices,* VISIONWORKS https://vsp.widen.net/s/hdhqsccwlq/notice-of-privacy-practices  (last visited February 23, 2024).
[34] As an example, according to its quarterly report for the period ending June 30, 2023, Meta earned a total revenue of $31,999,000,000, of which $31,498,000,000 consisted of advertising, representing 98% of total revenue. *See*

71.    To increase the value and effectiveness of its advertising, Meta allows its advertising customers to target "audiences" that are likely to respond to the advertising.

72.    To develop these "audiences," Meta collects information on its users regarding: what "ads they click," the webpages "they engage with," "activities [its users] engage in across Meta technologies related to things like their device usage and travel preferences," "demographics," and "the mobile device they use and the speed of their network connection."[35]

73.    To assist in collecting this valuable data, Meta developed its tracking tools, such as the Pixel and Conversions API, to allow third-parties to provide Meta more information on Meta's users, to ensure that the ads Meta sells "are shown to the right people," and allow Meta and third parties to "measure the results" of advertising campaigns.[36]

74.    In exchange for participating in this program, third-party websites can gain insights into their advertising efforts in an attempt to "drive more sales,"[37] either by developing better targeted advertising campaigns by analyzing customer activity on the website or by retargeting customers on other websites with advertising purchased through Meta.[38]

75.    Both Visionworks and Meta are incentivized to collect as much information from Tracked Users as possible.

---

*Meta Investor Relations: Meta Reports Second Quarter 2023 Results*, FACEBOOK (Jul. 26, 2023) https://investor.fb.com/investor-news/press-release-details/2023/Meta-Reports-Second-Quarter-2023-Results/default.aspx (last visited February 23, 2024).
[35] *Business Help Center: About detailed targeting*, FACEBOOK https://www.facebook.com/business/help/182371508761821?id=176276233019487 (last visited February 23, 2024).
[36] *Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited February 23, 2024).
[37] *Id.*
[38] *Introduction: What is the Meta Pixel?*, FACEBOOK https://www.facebook.com/business/tools/meta-pixel (last visited February 23, 2024).

**2.      Visionworks utilized Meta's Pixel to monetize Tracked Users' Queries and Webpage Interactions**

76.      Meta offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which then shares these observations with Facebook.

77.      The Pixel can only be purposely added by website developers to a website.  A website operator must link a related Facebook account with its Pixel, and then add code to each webpage on the website to make use of the Pixel.[39]

78.      Visionworks effectuated the steps to add the Pixel to the Website.

79.      The Pixel is employed by website operators to gather, collect, and then share user information with Facebook.[40]  Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[41]

80.      Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.  Here, the Website shares both.

81.      The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, including which webpages the pixel should be added to, which events should be monitored, and what information is disclosed, including whether such information is concealed using a "hash."[42]  Defendant did not hash users' information here.

---

[39] *How to set up and install a Meta Pixel*, FACEBOOK
https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited February 23, 2024).

[40] The Facebook Pixel allows websites to track Tracked User activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta for Developers: Meta Pixel*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/ (last visited February 23, 2024).

[41] *See Introduction: What is the Meta Pixel*, FACEBOOK https://www.facebook.com/business/tools/meta-pixel (last visited February 23, 2024).

[42] Hashing takes values of various lengths and converts them to a fixed-length value (based on number of characters), and in this process encrypts the data.  *See* https://developer.mozilla.org/en-US/docs/Glossary/Hash  *See Hash, Mozilla* https://developer.mozilla.org/en-US/docs/Glossary/Hash  *See Hash*, MOZILLA https://developer.mozilla.org/en-US/docs/Glossary/Hash (last visited February 23, 2024).

###### i.    The Website Implemented the Pixel

82.    To activate and employ a Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[43]  For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[44]

83.    Website developers must also agree to Meta's Business Tools Terms before making use of the Pixel, the terms of which are described in Section G.

84.    Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[45] as well as connect the Pixel to a Facebook Ad account.[46]

85.    To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the Pixel code to the website's code.

86.    Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the

---

[43] *Business Help Center: How to create a Meta Pixel in Business Manager*, FACEBOOK https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited February 23, 2024).
[44] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL https://sproutsocial.com/insights/facebook-business-manager/ (last visited February 23, 2024).
[45] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited February 23, 2024).
[46] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/622277416185967 (last visited February 23, 2024).

Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[47] (v) domain verification, and (vi) configuring web events.[48]

87.    Once the Pixel is operational, it can begin collecting and sharing user activity data as instructed by the website developers.

88.    A Pixel cannot be placed on a website by a third-party without being given access by the website's owner.

89.    Thus, Visionworks took the affirmative steps necessary to add the Pixel its Website.

90.    When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID" or "FID") – is automatically created and stored on the user's device for up to a year.[49]

91.    A Facebook UID can be used, by anyone, to easily identify a Facebook user.

92.    Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

---

[47] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited February 23, 2024).

[48] *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited February 23, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited February 23, 2024).

[49] *Privacy Center: Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited February 23, 2024).

ii.        **The Pixel as a Tracking Tool**

93.        The Pixel tracks user-activity on web pages by monitoring events which,[50] when triggered, causes the Pixel to automatically send data directly to Facebook.[51]

94.        Examples of Pixel events utilized by websites include: a user loading a webpage with (i) with a Pixel installed (the "PageView event"), or (iii) when pre-designated buttons are clicked, such as the "add to cart" button, (the "SubscribedButtonClick" event, collectively, the "Pixel Events"), by passing along detailed metadata tags,[52] or (iii) using custom designed Pixel events such as when users schedule an eye exam (the "Schedule Eye Exam" event). The Website utilizes these Pixel Events.[53]

95.        When a Pixel Event is triggered, an "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[54]

96.        The HTTP Request includes a Request URL and embedded cookies such as the c_user cookie.  It may also include information in its Payload,[55] such as metadata tags, or it may contain a "parsed" version of the Request URL.[56]

---

[50] *Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited February 23, 2024).
[51] *See generally Id.*
[52] *Meta for Developers: Reference - standard events*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/reference/ (last visited February 23, 2024).
[53] The presence of Pixel events, such as the Microdata, PageView, and AddToCart events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See About the Meta Pixel Helper*, FACEBOOK https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited February 23, 2024).
[54] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited February 23, 2024).
[55] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body.  Payloads typically transmit form data, image data, and programming data.  *See Request Payload Variation*, SITESPECT *https://doc.sitespect.com/knowledge/request-payload-trigger* (last visited February 23, 2024).
[56] Data in request headers and payload headers is often unreadable and unstructured, which is why internet browsers and other software "convert data into a more readable and organized format, helping to extract relevant information while investing minimal time in interpreting a data set.  *See What is data parsing?*, TIBCO

### iii.       The Pixel Shares Tracked Users' Website Interactions

97.     When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[57]

98.     The URL's path contains information about user activity, such as which content is searched for or clicked, in addition to the parameters.

99.     By way of example, the following screenshots depict how parameters are used to share Queries and how the URL path mirrors the name of the product being viewed on the Website:



*Figure 2 - Visionworks website uses URL parameters to convey Query information*[58]

https://www.tibco.com/reference-center/what-is-data-parsing#:~:text=Data%20parsing%20is%20converting%20data,challenging%20to%20read%20and%20comprehend (last visited February 23, 2024).

[57] *Meta for Developers: Conversion Tracking*, FACEBOOK   https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited February 23, 2024).

[58] *Search Results: Ray Ban*, VISIONWORKS https://www.visionworks.com/frames/ray-ban/brands-frames-ray-ban (last visited  February 23, 2024Feb.).



Figure 3 - Visionworks Website discloses product information through URL Path[59]

100.    The parameters and/or path for a Request URL may include the category or name of a product being searched for, depending on what Queries a Tracked User uses in the Search Bar.

101.    The PageView, SubscribedButtonClick, and Schedule Eye Exam events disclose Tracked Users' Request URLs, leading to the PageView event disclosing Tracked Users' Queries and health information research, the SubscribedButtonClick event disclosing which items are being purchased, and the Schedule Eye Exam event disclosing when and where users schedule eye exams, as depicted below:

---

[59] *Search Results*, MP 6100, VISIONWORKS https://www.visionworks.com/mp-6100/product/0111015450003?variantName=x_color&variantValue=Black-Crystal (last visited February 23, 2024).



*Figure 4 - PageView event triggered on the Website, disclosing Query to Facebook*



*Figure 5 - PageView event triggered on the Website, disclosing health research to Facebook*



*Figure 6 - SubscribedButtonClick tracks when Tracked Users add identified items to their Visionworks Website carts*



*Figure 7 – Schedule Eye Exam tracks when Tracked Users schedule eye exams with specific physical Visionworks locations*

102.    PageView events are triggered by default whenever the Pixel is loaded onto a user's web browser.[60]

103.    When a PageView event is triggered, it sends a request to Facebook containing data, including, but not limited to, its properties, as depicted above in Figures 4 and 5.

104.    Schedule Eye Exam events are custom events used by Visionworks which appear to trigger whenever users load the webpage to pick a location to schedule an eye exam.[61]

105.    When a Schedule Eye Exam event is triggered, it sends a request to Facebook containing data, including, but not limited to, its metadata properties, as depicted above in *Figure 7.*

106.    While little documentation is available for the SubscribedButtonClick events, they appear to be triggered when users click buttons to submit forms, button clicks in general, and even just clicks on various elements of webpages, including links.[62]

---

[60] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited February 23, 2024).
[61] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited February 23, 2024).
[62] *Id.*

107. When a SubscribedButtonClick event is triggered, it sends a request to Facebook containing data, including, but not limited to, its properties, as depicted above in *Figure 6*.

108. When a "c_user" cookie is present on a user's computer, the HTTP Requests generated by the Pixel Events include users' c_user cookies by copying the c_user cookie into the Request Header, as depicted in *Figure 8*, next page:



| Request URL: | https://www.facebook.com/tr/?id=5285427545860099&ev=Schedule%20Eye%20Exam&dl=https%3A%2F%2Flocations.visionworks.com%2F%3F_ga%3D2.196971820.1864664553.1708213718-1274734943.1707415629&rl=https%3A%2F%2Fwww.visionworks.com%2F&if=false&ts=1708278057937&cd[label]=%7B%22url%22%3A%20%22%2Fll%2FUS%2FCA%2FSanta-Ana%2F3333-S-Bristol%22%2C%20%22location_id%22%3A%20%226477c9e8e4b0af3051de379e%22%7D&cd[category]=Store%20Locator&cd[value]=1&cd[eventType]=click&sw=2560&sh=1440&v=2.9.147&r=stable&ec=4&o=4126&fbp=fb.1.1707415629382.826307516&ler=other&cdl=API_unavailable&it=1708277954520&coo=false&exp=e1&rqm=GET |
|---|---|
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | 157.240.11.35:443 |
| Referrer Policy: | strict-origin-when-cross-origin |
| ▶ Response Headers (10) | |
| ▼ Request Headers | |
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/?id=5285427545860099&ev=Schedule%20Eye%20Exam&dl=https%3A%2F%2Flocations.visionworks.com%2F%3F_ga%3D2.196971820.1864664553.1708213718-1274734943.1707415629&rl=https%3A%2F%2Fwww.visionworks.com%2F&if=false&ts=1708278057937&cd[label]=%7B%22url%22%3A%20%22%2Fll%2FUS%2FCA%2FSanta-Ana%2F3333-S-Bristol%22%2C%20%22location_id%22%3A%20%226477c9e8e4b0af3051de379e%22%7D&cd[category]=Store%20Locator&cd[value]=1&cd[eventType]=click&sw=2560&sh=1440&v=2.9.147&r=stable&ec=4&o=4126&fbp=fb.1.1707415629382.826307516&ler=other&cdl=API_unavailable&it=1708277954520&coo=false&exp=e1&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9,ja-JP;q=0.8,ja;q=0.7 |
| Cookie: | sb=0r5TYP8LbS_cSfNNh1471Jbm; c_user=▮▮▮▮▮▮; datr=i2X7ZJuhC1QdfS5Gb9_Ejftw; |

*Figure 8 - Embedded c_user cookie in Pixel Request transmitted to Facebook via Schedule Eye Exam event* [63]

109. This "c_user" cookie contains an unencrypted, numeric unique identifier (the Facebook FID) which may be used to identify a user, as described in Section F.

---

[63] *Id.*

110. The Pixel Events, when triggered, automatically cause a user's computer to duplicate users' FIDs, Search Terms, and/or PHI at the time that information is submitted to Visionworks, insert that information into the HTTP Request it generates, and then send that HTTP Request to "www.facebook.com/tr" as shown above in *Figure 8*. In short, triggering the Pixel Events results in the sharing of a user's website interactions (including PHI) and Facebook UID with Facebook.

111. This behavior is not limited to scheduling eye exams on the Website.

112. The Pixel Events are active on other parts of the Website, including webpages where Tracked Users attempt to shop on the Website, and on webpages where Tracked Users search for information on eye health, as depicted below:



*Figure 9 - PageView triggers when Tracked Users attempt to click on articles concerning eye health on the Website*

▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /privacy_sandbox/pixel/register/trigger/? |
| | id=892194011156043&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.visionworks.com% |
| | 2F0rx7216%2Fproduct%2F0114010050138%3FvariantName%3Dx_color%26variantValue%3DBlue |
| | &rl=https%3A%2F%2Flocations.visionworks.com%2F&if=false&ts=1708279827558&cd[buttonFe |
| | atures]=%7B%22classList%22%3A%22btn%20btn-lg%20primary%20btn-addToCart%20center- |
| | block%22%2C%22destination%22%3A%22%2C%22id%22%3A%22%22%2C%22imageUrl%22 |
| | %3A%22%2Ffile%2Fgeneral%2Fwhite-shopping-cart-for- |
| | cta.svg%22%2C%22innerText%22%3A%22%20ADD%20TO%20CART%22%2C%22numChildButton |
| | s%22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3A%22button%22%2C%22nam |
| | e%22%3A%22%22%2C%22value%22%3A%22%22%7D&cd[buttonText]=%20ADD%20TO%20CAR |
| | T&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%220RX7216%20in%20Bl |
| | ue%20%7C%20Visionworks%22%7D&sw=2560&sh=1440&v=2.9.147&r=stable&ec=4&o=4126& |
| | fbp=fb.1.1707415629382.826307516&ler=other&cdl=API_unavailable&it=1708279245447&coo= |
| | false&es=automatic&tm=3&exp=e1&rqm=FGET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9,ja-JP;q=0.8,ja;q=0.7 |
| Attribution-Reporting-Eligible: | event-source, trigger |
| Cookie: | sb=0r5TYP8LbS_cSfNNh1471Jbm; c_user=████████████; datr=i2X7ZJuhC1QdfS5Gb9_Ejftw; |
| | ps_n=0; xs=47%3AKkyLXdIOfDAkyA%3A2%3A1681934240%3A-1%3A- |
| | 1%3A%3AAcWzcyH5_yn751kkdeC9vyVIya4q6OuzhTyNv5eQ9A2L; |
| | fr=1Q78peV0a04SmT7Vz.AWX74tl-zluIC_T5qLRHrIBTGGQ.Blv7iu.vA.AAA.0.0.Blv7iu.AWX8EGxIhKE: |

*Figure 10 - SubscribedButtonClick triggers when Tracked Users attempt to add items to their cart on the Website*

▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/? |
| | id=528542754586099&ev=PageView&dl=https%3A%2F%2Fwww.visionworks.co |
| | %3FNtt%3Dray- |
| | ban%26Rdm%3D417%26searchType%3Dsimple%26type%3Dsearch&rl=https%3 |
| | visionworks.com%2F&if=false&ts=1708279245758&sw=2560&sh=1440&v=2.9. |
| | 0&o=4126&fbp=fb.1.1707415629382.826307516&ler=other&cdl=API_unavailab |
| | 447&coo=false&exp=e1&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9,ja-JP;q=0.8,ja;q=0.7 |
| Cookie: | sb=0r5TYP8LbS_cSfNNh1471Jbm; c_user=████████████; datr=i2X7ZJuhC1Q |
| | ps_n=0; xs=47%3AKkyLXdIOfDAkyA%3A2%3A1681934240%3A-1%3A- |
| | 1%3A%3AAcWzcyH5_yn751kkdeC9vyVIya4q6OuzhTyNv5eQ9A2L; |
| | fr=1Q78peV0a04SmT7Vz.AWX74tl-zluIC_T5qLRHrIBTGGQ.Bly7ju.vA.AAA.0.0.Bly7j |
| | usida=eyJ2ZXIiOjEsImIkIjoiQXM4dTBkMDFiOWZiZmgiLCJ0aW1IjoxNzA3ODkwM |
| Referer: | https://www.visionworks.com/ |

*Figure 11 - PageView triggers when Tracked Users search for products on the Website*

113. As described in paragraph 110, the HTTP Requests generated by the Pixel Events depicted in Figures 9-12 include not only the user activity information but also their FID.

114. Thus, PHI of Plaintiffs and the Class Members have automatically been shared with Facebook as a result of Visionworks' decision to add the Pixel to the Website.

115. As described above, the Pixel captures information on the Website and sends that information to Meta through triggered Pixel Events.

116. The Pixel passed this information through the HTTP Requests sent to facebook.com/tr.

117. The Pixel intercepted and shared PHI related to medical products sought by, viewed by, and added to cart by Plaintiffs.

118. The Pixel is active across the Website, including prescription product pages and the scheduling of eye examinations on the website, as implemented by Visionworks.

119. When a Tracked User views or interacts with those medical products or services on the Website, those actions are intercepted and monetized by the Tracking Entity.

### iv. The Pixel Transmissions Are Sent From Users' Computers

120. The site of the harm is the location of the device used by Tracked Users. This is supported by how the Pixel operates.

121. Once the Pixel was programmed onto the Website, it then surreptitiously loaded on to users' computers whenever they visit the Website.

122. The Pixel, without users' knowledge, runs or executes on users' devices, causing users' devices to duplicate the information obtained from Tracked Users' activity on a webpage utilizing the Pixel, and the Pixel causes users' devices to send that information to Meta.

123.    In essence, (i) the Pixel is loaded onto a user's device, (ii) causes the user's device to violate a user's privacy by tracking their activity, and (iii) utilizes the user's device to disclose that information to a third party.

124.    The location of the device executing the Pixel when used by a Tracked User to visit the Website is thereby the location of the harm.

**F.    The FID can be easily used to Identify Users**

125.    A person of ordinary skill, in possession of the PII in question, is capable of converting the data into personally identifiable information without the addition of information from outside sources.

126.    A person of ordinary skill need not have the technical proficiency to gain access to the data itself, only the ability to use the information once in possession to identify the user.

127.    When sending HTTP Requests, the internet browser breaks the Requests into manageable pieces by encoding the Request in small packets (a process called "transfer encoding").[64]

128.    The images of Pixel transmissions captured by Plaintiffs in the developer's console, (*see e.g., supra*, *Figure 7*) capture the data in this encoded condition.

129.    However, the information does not stay encoded and is not *handled* by third-party recipients of the PII (here, Facebook) in this encoded state.

130.    To start, once the transmission is received, the transfer encoding is removed by the recipient automatically, simplifying the data to an easier-to-digest fashion.

---

[64] *See Transfer-Encoding,* MOZILLA  https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/Transfer-Encoding (last visited February 23, 2024).

131.    After the transfer encoding is automatically removed, which occurs whenever a computer processes a HTTP Request, Facebook's systems then automatically synthesize the data into simple-to-read and simple-to-use formats.[65]

132.    On information and belief, the data contained within the Pixel transmissions sent to Facebook by Defendant, including the PHI and UID, is automatically processed by Facebook's algorithms before any person interacts with the data.[66]

133.    Facebook logs the time and date of each Pixel event activation, the URL associated with each event, the Domains associated with each event, and the devices associated with each event – all of which are neatly compiled and categorized for website developers to access and view through the use of the Pixel.[67]

134.    Facebook also makes the data provided to it through the Defendant's Pixel Events available and similarly easy to use for Facebook's advertising customers.

135.    Facebook offers website developers a tracking option which enables developers to target website users by matching those users to Facebook account holders via the Pixel.[68]  This provides quick and unfettered access to users' Facebook account information.  This is all facilitated through the availability and use of the UID.

136.    Facebook sells advertising to third parties who aim to target specific "audiences" based on a number of traits or factors, including demographic, interest-based, geographic, age-

---

[65] *Human Data Banks and Algorithmic Labour: Facebook Algorithmic Factory (2)*, SHARE LAB (Aug. 20, 2016) https://labs.rs/en/facebook-algorithmic-factory-human-data-banks-and-algorithmic-labour/ (last visited February 23, 2024).
[66] *See Id.*; also *Facebook Algorithmic Factory*, https://labs.rs/wp-content/uploads/2016/08/FacebookFactory-01.gif (last visited February 23, 2024) (visual of automation process and the detail that Facebook gathers on users).
[67] *See Facebook Events Manager: How To Use The Data From Your Tracking Pixel (Data Driven Daily Tip 195*, YOUTUBE (at 3:11/6:00) https://www.youtube.com/watch?v=R1qAmVAOzO8 (last visited February 23, 2024).
[68] *Business Help Center: About website custom audiences*, FACEBOOK https://www.facebook.com/business/help/610516375684216?id=2469097953376494 (last visited February 23, 2024).

based, and gender-based categories, using targeted advertising data collected by website developers implementing the Pixel on their websites.[69] These traits are derived from, at least in part, Facebook profiles.

137.    Facebook creates targetable audiences by combining the data captured by the Pixel (including associating website activity to accounts through the UID), and other tracking software provided by Facebook, to categorize its users into marketable segments.[70]

138.    Thus, UIDs are easily accessed by Facebook and, in fact, used by Facebook.

139.    A person of ordinary skill, once in possession of the UID, could easily turn the UID into personally identifiable information.

140.    The UID contains a series of numbers used to identify a specific profile, as depicted below:



*Figure 13 - Sample c_user ID number of test account created by Plaintiffs' counsel to investigate the Pixel, captured by a Pixel Event*

141.    A Facebook UID can be used by anyone to easily identify a Facebook user by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).

142.    Using the UID from *Figure 10*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the  Facebook profile associated with the UID, as depicted in *Figure 14*, next page:

---

[69] *See Meta Ads: The ad auction explained*, FACEBOOK https://www.facebook.com/business/ads/ad-auction (last visited February 23, 2024).

[70] *See generally Business Help Center: About event match quality*, FACEBOOK https://www.facebook.com/business/help/765081237991954?id=818859032317965 (last visited February 23, 2024) (noting a key metric is how well customer event information matches to a Meta account).



*Figure 14 - Appending UID of a user to "facebook.com/" results in the user being redirected to the user's profile*

143.    That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with that UID.

**G.    <u>Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' Website Activity</u>**

144.    Plaintiffs and Class members were unaware of the tracking tools intercepting their confidential communications with the Website.

145.    Plaintiffs and Class members reasonably believed that communications to the Website were made in confidence and that they would not be shared with third parties.

146.     The terms to the website are bifurcated, with a gray bar that follows the bottom of the user's screen that alerts users that they "may choose to consent" to certain cookie practices, without requiring an actual acceptance, and the actual terms are attached in a browsewrap format, with a hyperlink at the bottom of the page, which users must scroll to the very bottom of a large webpage to see, as depicted below (highlighted by red arrows):



147.     While the Terms of Use are quiet as to the handling of protected health information,[71] the Privacy Policy explains that it "does not supersede ore replace [Defendant's] HIPAA Privacy Notice . . . [which] addresses more specifically [Defendant's] privacy practices

---

[71] Terms of Use https://www.visionworks.com/terms-of-use-agreement  *Terms of Use*, VISIONWORKS https://www.visionworks.com/terms-of-use-agreement (last visited February 23, 2024).

and a user's rights concerning any health information that [Defendant] may receive or maintain concerning the user."[72] For specifics, the Privacy Policy claims that the Notice of Privacy Practices contains additional information.

148.    Defendant's HIPAA Privacy Policy, called "Notice of Privacy Practices" (the "NPP"), notes Visionworks is "required by applicable federal and state law to maintain the privacy of [user's] protected health information[.]" The NPP provides that, Protected Health Information (PHI) includes "demographic information, collected from you or created or received by a health care provider, a health plan, your employer, or a healthcare clearinghouse that relates to: (i) your past, present, or future physical or mental health or condition; (ii) the provision of health care to you; or (iii) the past, present, or future payment for the provision of health care to you."[73]

149.    The NPP notes that PHI can be disclosed to recommend treatment alternatives to patients, or to assist public health and safety issues, such as preventing disease, assisting in product recalls, reporting adverse reactions to medications, or preventing or reducing a serious threat to anyone's health or safety."[74]

150.    Specifically, Visionworks claims that it may "collect, use, and disclose PHI for certain of our activities, including payment and healthcare operations" but only uses PHI for marketing where that marketing is "face-to-face" discussions of products or services, or to provide "inexpensive promotional gifts[.]"[75]

151.    In some cases, Visionworks retains the right to contact users to provide information about treatment alternatives that may be of interest to users, where permitted by law.

---

[72] *Visionworks Online Privacy Policy*, VISIONWORKS https://www.visionworks.com/privacy-policy (last visited February 23, 2024).
[73] *Notice of Privacy Practices*, VISIONWORKS https://vsp.widen.net/s/hdhqsccwlq/notice-of-privacy-practices (last visited February 23, 2024).
[74] *Id.*
[75] *Id.*

152.    Visionworks claims it "cannot use or disclose" users' PHI for any reason except those described in this Notice without written authorization" from users.

153.    Meta also guides and cautions website operators of the dangers of using its tracking tools without first providing notice of and then obtaining valid consent for invasively collecting Plaintiffs' protected data and either making that data available to third-parties or allowing third parties to intercept Plaintiffs' protected information.[76]

154.    Facebook provides notice through its Business Tools Terms, which encompasses the Pixel, Conversions API, and other tools, and through tutorials it provides on how to use the Pixel. Visionworks agreed to these terms, directly or as the effective owner of the Website, in order to utilize and employ the tracking tools.[77]

155.    Meta is clear that while Conversions API collects information through a web developers' servers, the Pixel is used to collect information from users' browsers.[78]

156.    Meta's Business Tools Terms, which a website must accept before making use of the Pixel, are clear that the Pixel will intercept, collect, and transmit two categories of data: (i) "Contact Information" which "personally identifies individuals, such as names, email addresses, and phone numbers" which are used "for matching purposes[;]" and (ii) "Event Data" that reveals information about "people and the actions that they take on your websites and apps . . . such as visits to your sites . . . and purchases of your products" (collectively Business Tool Data).[79]

---

[76] *Meta Business Tools Terms*, FACEBOOK (Section 3(c)(i))
https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpew1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited February 23, 2024).
[77] *Meta Business Tools Terms*, FACEBOOK
https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpew1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited February 23, 2024).
[78] *Meta for Developers: Conversions API End-to-End Implementation*, FACEBOOK
https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation/ (last visited February 23, 2024).
[79] *Meta Business Tools Terms*, FACEBOOK (Section 1(a)(i))
https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpew1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited February 23, 2024).

157.    Meta's Business Tools Terms also highlight that Meta "will not share Business Tool Data provided by a website, including advertisers, unless the website developers opt-in to Facebooks advertising programs or disclosure is mandated by law.[80] In short, Visionworks must have opted-in to Meta's data sharing program for advertising purposes.

158.    Meta is also clear in its Business Tools Terms that once they receive Business Tool Data from a website developer, like Visionworks, Meta will "process the Contact Information . . . to match the Contact Information against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[81]

159.    Perhaps owing to Meta's practice of tying the Contact Information and Event Data together, Meta's terms warn that website developers **must** not "share Business Tool Data with [Meta] that you know or reasonably should know . . . includes health . . . information or other categories of sensitive information[.]"[82]

160.    In contravention to Meta's terms and guidance, Defendant collected Plaintiffs' PHI and Plaintiffs were not given notice of the use of the tracking tools on the Website, including Meta's Pixel.

161.    As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their data when communicating Queries to the Website, viewing, or adding items to their digital carts on the Website, or scheduling eye exams.

---

[80] *Id.* at Section 1(b)
[81] *Id.* at Section 2(a)(i).
[82] *Id.* at Section 1(h)

## TOLLING

162.    The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Visionworks' conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

163.    As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Website that Visionworks was disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Visionworks' unlawful conduct with reasonable diligence.

164.    Visionworks secretly incorporated the Tracking Entity' tracking tools into the Website, providing no indication to Tracked Users that their communications would be disclosed to these third parties.

165.    Visionworks had exclusive and superior knowledge that the Tracking Entity' tracking tools incorporated on its Website would disclose Tracked Users' protected and private information and confidential communications, yet it failed to disclose to Tracked Users that by interacting with the Website that Plaintiffs' and Class Members' Queries, PHI, and website interactions would be disclosed to third parties.

166.    Plaintiffs and Members of the Classes could not with due diligence have discovered the full scope of Visionworks' conduct because the incorporation of the Tracking Entity' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that Visionworks was disclosing and allowing the interception of such information to these third parties.

167.    The earliest Plaintiffs and Class Members could have known about Visionworks' conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs bring this action individually and on behalf of the following Classes:

Nationwide Class of Tracked Users: All persons in the United States whose searches and activity on the Website were intercepted, stored, and shared through the use of tracking tools (the "Class" or "Nationwide Class").

Pennsylvania Subclass of Tracked Users: All persons in Pennsylvania whose searches and activity on the Website were intercepted, stored, and shared through the use of tracking tools (the "Pennsylvania Class").

169.    Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

170.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into additional subclasses, or otherwise modified in any way.

171.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

172.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Visionworks' Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

173.    <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, visited the Website and searched for medical- or otherwise sensitive health-related products, added the items to their cart and/or purchased the items on the Website.  Plaintiffs' and Class members' PHI was then disclosed and shared by Visionworks to third parties.

174.    <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

175.    <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

176.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a.  Whether Visionworks implemented the Tracking Entity' tools on the Website;

b.  Whether the Tracking Entity collected Plaintiffs' and the Class's PHI, Queries, and webpage interactions on the Website;

c.  Whether Visionworks' disclosures of Plaintiffs' and Class Members' PHI was without consent or authorization;

d.  Whether Visionworks unlawfully disclosed and continue to disclose the PHI, Queries, and webpage interactions of Tracked Users;

e.  Whether Visionworks' omissions regarding the practices alleged herein constitute an unfair and/or deceptive practice; and

f.  Whether Visionworks' disclosures were committed knowingly.

177.  Information concerning Visionworks' Website data sharing practices is available from Visionworks' or third-party records.

178.  Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

179.  The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Visionworks.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

180.  Visionworks has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

181.    Visionworks has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

182.    Given that Visionworks' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

### VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. § 2510, *et. seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

183.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 32 through 167 as though fully set forth herein.

184.    Plaintiffs bring this claim individually and on behalf of the members of the proposed class against Facebook and Visionworks.

185.    Codified under 18 U.S.C. U.S.C. §§ 2510 *et seq.*, the Federal Wiretap Act (the "Wiretap Act") prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

186.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

187.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

188.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

189.    The Wiretap Act defines "person as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

190.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

191.    Visionworks is a person under the Wiretap Act.

192.    The Pixel constitutes a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

193.    The confidential communications between Plaintiffs and the Nationwide Class and the Website, in the form of their PHI were intercepted by Visionworks and Meta, utilizing Meta's Pixel, and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

194.    The Wiretap Act is applicable to both the sending and receipt of communications.

195.    Plaintiffs and the Nationwide Class had a reasonable expectation of privacy in their electronic communications with the Website in the form of their PHI. Interception of Plaintiffs' and Nationwide Class Members' communications with the Website occurs in the regular course of using the Website, whether to search for information related to health conditions, schedule appointments, or purchase glasses and/or contacts. Moreover, Meta is not a party to these communications.

196.    Visionworks violated the Wiretap Act by using Meta and its Pixel to intercept Plaintiffs' communications with Visionworks, and for utilizing the communications that Meta intercepted and analyzed for advertising purposes. 18 U.S.C. § 2511(1)(a)–(c).

197.    The interception and use of Plaintiffs' and Nationwide Class Members' communications with their health care provider, Visionworks, was intentional and knowing as indicated by: (a) Visionworks choice to use the Pixel on its Website; (b) Visionworks' knowledge that utilizing Pixel on the Website would allow Meta to link user activity and user identities, allowing Meta to create targetable audiences; and (c) Visionworks' failure to prevent sensitive health information from being transmitted to Meta using the Pixel.

198.    Visionworks' use of the Pixel to intercept these communications resulted in Plaintiffs' and Class Members' communications with Visionworks to be duplicated and sent to Meta the instant the Pixel Events were triggered.

199.    The intercepted communications, in the form of PHI, between Plaintiffs, the Nationwide Class Members, and the Website constitute the "contents" of the communications for purposes of the Wiretap Act.

200.    Visionworks did not receive consent from Plaintiffs or the Nationwide Class before it used the Pixel to intercept and disclose their PHI to Meta, and subsequently used their sensitive PHI for advertising purposes. Indeed, such consent could not have been given as Visionworks ever sought any form of consent from Plaintiffs or the Nationwide Class to intercept, record, and disclose their private communications with the Website, and explicitly claimed it would not use PHI for such purposes.

201.    As detailed above, Visionworks' unauthorized interception, disclosure and use of Plaintiffs' and the Nationwide Class Members' PHI was only possible through its knowing, willful, or intentional placement of Pixel on the Website. 18 U.S.C. § 2511(1)(a).

202.    Visionworks' use of the Pixel to intercept Plaintiffs' and Class Members' communications was done for purposes of committing criminal and tortious acts in violation of the laws of the United States, including criminal violation of HIPAA, 42 U.S.C. § 1320d-6

203.    Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

204.    Under the statute, "individually identifiable health information" (IIHI) is defined as "any information, including demographic information collected from an individual, that—(A) is created or receive by a healthcare provider …; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of healthcare to an individual, or the past, present, or future payment for the provision of healthcare to an individual, and (i) identifies the individual, or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6).

205.    Thus, under the plain language of the statute, IIHI includes "any information …. that … relates to … the provision of healthcare to an individual" and either identifies the individual or with respect to which there is a reasonable basis to believe that the information can be used to identify the individual. The clause relating to "the provision of healthcare to an individual" covers patient-status because the fact that someone is a patient of a specific provider is information relating to the fact that the specific healthcare provider provides healthcare to the individual.

206.    The information at issue in this case fits the "provision of healthcare to an individual" element because it includes patient-status when Visionworks discloses patients' attempts to schedule a doctor visit or specific medical care facility.

207.    The information at issue in this case also fits the "relates to the past, present, or future physical or mental health or condition of an individual" because the information disclosed related to the Plaintiffs' doctors and conditions.

208.    The information at-issue in this case fits the elements for identifiability because it includes URLs, the c_user cookie (and the FID contained therein), and other information that fits under the list of identifiers in the HIPAA de-identification rule (rendering them "identifiable" as a matter of law) and that are identifiable as a matter of fact.

209.    Visionworks' conduct violated 42 U.S.C. § 1320d-6 in that it:

    a)  Used and caused to be used c_user cookies associated with specific patients without patient authorization;

    b)  Disclosed individually identifiable health information to, at a minimum, Meta.

210.    Visionworks' conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Visionworks' use of the Pixel was for Visionworks' commercial advantage to increase revenue from existing patients and gain new patients.

211.    Plaintiffs and the Nationwide Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiffs and the Nationwide Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Nationwide Class and any profits made by Visionworks as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT II

**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTRAL ACT ("WESCA")**
**18 Pa. C.S.A. § 5701, *et seq.***
**(On Behalf of Plaintiff Young and the Pennsylvania Class)**

212.    Plaintiff Young incorporates by reference and re-allege each and every allegation set forth above in paragraphs 32 through 167 as though fully set forth herein.

213.    Plaintiff Young bring this claim individually and on behalf of the members of the proposed Pennsylvania Class against Visionworks.

214.    Visionworks is a "person" as defined by 18 Pa. C.S.A. § 5702.

215.    WESCA prohibits any person from willfully intercepting, endeavoring to intercept, or procuring of any other person to intercept or endeavor to intercept, any wire, electronic, or oral communication. 18 Pa. C.S.A. §§ 5701, 5703(1).

216.    Visionworks procured Meta's services to "intercept" Plaintiff Young's and Pennsylvania Class Members' communications with Visionworks, pursuant to WESCA, which defines "intercept" as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. C.S.A. § 5702.

217.    Visionworks subsequently used the contents of Plaintiff Young's communications with Visionworks, intercepted and processed by Meta, to target users with advertising, which is prohibited under WESCA. 18 Pa. C.S.A. § 5703(2)-(3).

218.    WESCA also prohibits the knowing access to obtain access to a wire or electronic communication while it is in electronic storage by intentionally accessing, or exceeding the scope of access to, a facility through which an electronic communication service is provided. 18 Pa. C.S.A. § 5741(a)(1)–(2).

219.    Visionworks obtained tools from Meta to intercept and/or improperly access the communications between Visionworks and its website visitors in the conduct of its business, in violation of WESCA.

219.    The devices used in this case, include, but are not limited to:

    a.  Visionworks' own computers, which were used to add the Pixel to its webpages;

    b.  Visionworks' servers used to host its webpages;

    c.  Plaintiff Young's and Pennsylvania Class Members' personal computing devices;

    d.  Plaintiff Young's Pennsylvania and Class Members' web browsers;

    e.  The Pixel itself;

    f.  Internet cookies;

    g.  Third-party code utilized by Visionworks; and

    h.  Computer servers of third parties (including Meta).

220.    Defendant aided in the interception of communications between Plaintiff Young and Pennsylvania Class Members and Defendant that were redirected to and recorded by third parties without the Plaintiff Young's or Pennsylvania Class Members' consent.

221.    WESCA confers a private civil cause of action to any person whose wire, electronic or oral communication is intercepted, disclosed, or used in violation thereof against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S.A. § 5725(a).

222.    Plaintiff Young and the Pennsylvania Class Members are patients of Visionworks and need access to Visionworks' Website (www.Visionworks.com), in connection with receiving health care from Visionworks. Because Plaintiff Young and Pennsylvania Class members need to,

and so will continue to use Visionworks' Website in the future, if Visionworks' unfair, unlawful, and deceptive trade practices are allowed to continue, Plaintiff Young and Pennsylvania Class members are likely to suffer continuing harm in the future.

220.     Plaintiff Young and members of the Pennsylvania Class Members seek all relief available for violations of WESCA, including recovery of actual damages that are not less than liquidated damages computed at a rate of $100.00 a day for each day of violation or $1,000.00, whichever is higher; punitive damages; and reasonable attorneys' fees and other litigation costs reasonably incurred, along with injunctive relief.

### COUNT III

**VIOLATION OF THE TEXAS CRIMINAL WIRETAP ACT**
**(TEXAS CODE OF CRIMINAL PROCEDURE, ARTICLE 18A.502(1); AND**
**TEXAS PENAL CODE SECTIONS 16.02(B)(1)–(B)(3), (B)(5))**
**(On Behalf of Plaintiffs and the Nationwide Class)**

221.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 32 through 167 as though fully set forth herein.

222.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Visionworks.

223.     Section 16.02(b) of the Texas Penal Code criminalizes the intentional interception, disclosure, or use of electronic communications, and Article 18A.502 of the Texas Code of Criminal Procedure provides that a victim may bring a civil cause of action against a person or entity who commits such offenses against him or her.  These two statutes are collectively known as the "Texas Criminal Wiretap Act." Under the Texas Criminal Wiretap Act, it is a crime for companies to intercept, procure another person to intercept, or use the contents of intercepted private electronic communications without the consent of all parties to the communication where

the communication is intercepted for the purpose of committing an unlawful act.  *See* TEX. PEN. CODE § 16.02(b)(1), (3), (c)(4)(B).

224.    Defendant's conduct violated Section 16.02(b) of the Texas Penal Code because Visionworks procured tools and services from Meta to intentionally intercept electronic, Plaintiffs and Class Members private communications with Visionworks containing Plaintiffs' and Class Members' PHI, as described more fully herein, without first obtaining class members' consent.

225.    Meta intercepted Plaintiffs' and Class Members' PHI so that it could use that information in the consumer-information databases that it sells to advertisers, where Visionworks was able to use that information to target its Websites' users with advertising.  The unauthorized disclosure and use of PHI is an unlawful act.  *See* 42 U.S.C. § 1320d-6(a)(3).  Accordingly, Visionworks intercepted Plaintiffs communications with their PHI for the purpose of committing an unlawful act and is thus liable under the statute.

226.    Plaintiffs and Class Members suffered harm as a result of Google's violations of the Texas Criminal Wiretap Act, and therefore seek all available relief under that statute.

## COUNT IV

### INTRUSION UPON SECLUSION
### (On Behalf of Plaintiffs and the Nationwide Class)

227.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 32 through 167 as though fully set forth herein.

228.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Visionworks.

229.    Visionworks intentionally intruded upon class members' solicitude or seclusion in that it effectively placed Meta in the middle of conversations including PHI to which it was not an authorized party.

230.    Visionworks' participation in Meta's tracking and interception of PHI were not authorized by Plaintiffs or Class members.

231.    Visionworks' enabling of Meta's intentional intrusion into Plaintiffs' and Class members' internet communications including PHI and their computing devices and web-browsers was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals against privacy and against theft.

232.    Secret monitoring of PHI is highly offensive behavior.

233.    Wiretapping and the surreptitious recording of communications including PHI is highly offensive behavior.

234.    Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]."  The desire to control one's information is only heightened while a person is handling PHI. Plaintiffs and Class members have been damaged by Visionworks' facilitation of Meta's intrusion upon their seclusion and are entitled to reasonable compensation including but not limited to disgorgement of profits related to the unlawful internet tracking.

## COUNT V

### BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiffs and the Nationwide Class)**

235.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 32 through 167 as though fully set forth herein.

236.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Visionworks.

237.    When Plaintiffs and Class Members provided their PHI to Visionworks, they entered into an implied contract pursuant to which Visionworks agreed to safeguard and not disclose their PHI without consent.

238.    Plaintiffs and Class Members would not have entrusted Visionworks with their PHI in the absence of an implied contract between them and Visionworks obligating Visionworks to not disclose PHI without consent.

239.    Plaintiffs and Class Members would not have used the Website in the absence of an implied contract between them and Visionworks obligating Visionworks to not disclose PHI without consent.

240.    Visionworks breached these implied contracts by disclosing Plaintiffs' and Class Members' PHI without consent to third parties like Facebook.

241.    As a direct and proximate result of Visionworks' breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of PHI.

242.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Visionworks' breach of implied contract.

**COUNT VI**

**BREACH OF CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

243.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 32 through 167 as though fully set forth herein.

244.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Visionworks.

245.    When Plaintiffs and Class Members provided their PHI to Visionworks, they entered into an express contract pursuant to which Visionworks, in the form of Visionworks Terms of Use on the Website.   That contract included the promise to protect nonpublic personal information given to Visionworks or that Visionworks gathered on its own, from disclosure.

246.    Visionworks breached its contractual obligations to protect the nonpublic personal information it possessed and was entrusted with when the information was disclosed to third-parties, absent consent.

247.    Plaintiffs and Class Members would not have entrusted Visionworks with their PHI in the absence of an express contract between them and Visionworks obligating Visionworks to not disclose PHI without consent.

248.    Plaintiffs and Class Members would not have used the Website in the absence of an express contract between them and Visionworks obligating Visionworks to not disclose PHI without consent.

249.    Visionworks breached these express contracts by disclosing Plaintiffs' and Class Members' PHI without consent to third parties like Facebook.

250.    As a direct and proximate result of Visionworks' breaches of these contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of PHI.

251.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Visionworks' breach of contract.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Visionworks, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

(b)    For an order declaring that the Visionworks' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Visionworks to immediately (i) remove the tracking tools from the Website or (ii) add, and obtain, the appropriate consent from Tracked Users;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)    For pre-judgment interest on all amounts awarded;

(h)    For an order of restitution and all other forms of monetary relief;

(i)    An award of all reasonable attorneys' fees and costs; and

(j)    Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated: February 23, 2024

**FOSTER YARBOROUGH PLLC**

By: */s/ Patrick Yarborough*
Patrick Yarborough
Jeffrey Lucas Ott
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
Email: patrick@fosteryarborough.com
Email: luke@fosteryarborough.com

**LEVI & KORSINSKY, LLP**

Mark S. Reich*
Courtney Maccarone*
Gary I. Ishimoto*
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiff*

*\*pro hac vice* forthcoming