**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

SAURAV SHARMA, DIANE YOUNG, JAIME STIEVE, and GEORGE DEAN, on Behalf of Themselves and All Others Similarly Situated,

Plaintiffs,

v.

VISIONWORKS OF AMERICA, INC.,

Defendant.

**Case No.: 5:24-cv-00206**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND MEDIATION**

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

III. LEGAL STANDARD ........ 4

IV. ARGUMENT ........ 5

A. There was No Assent to VisionWorks's Purported Terms ........ 5

B. The TOU is an Unenforceable Browsewrap Agreement ........ 6

C. Any Alleged Arbitration Agreement is Not Applicable to Named Plaintiffs ........ 9

D. The Mediation Agreement is Unenforceable ........ 9

E. Defendant Failed to Meet Its Burden to Establish the Existence or Enforceability of a Clickwrap Agreement ........ 11

V. CONCLUSION ........ 14

# TABLE OF AUTHORITIES

**Cases**

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. April 5, 2022) .......... 7, 8

*Brady v. St. John Baptist Par. Council*,
No. 14–1613, 2014 WL 4540072 (E.D. La. Sept. 11, 2014) .......... 4

*Cvent, Inc. V. Eventbrite, Inc.*,
739 F.Supp.2d 927 (E.D. Va. 2010) .......... 8

*DHI Grp. Inc. v. Kent*,
No. H-16-1670, 2017 WL 8794877 (S.D. Tex. April 21, 2017) .......... 6

*First Options of Chicago., Inc. v. Kaplan*,
514 U.S. 938 (1995) .......... 5

*Fleetwood Enters. v. Gaskamp,*
280 F.3d 1069 (5th Cir. 2002) .......... 5

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) .......... 6

*Hammond v. United States Fire Ins. Co. (Del.)*,
No. 4:22-CV-2004, 2023 WL 2142979 (S.D. Tex. Feb. 21, 2023) .......... 5

*Highland Com. Constr., Inc. v. Educ. Mgmt., Inc.*,
No. 23-543, 2023 WL 3601568 (E.D. La. May 23, 2023) .......... 4, 5

*Jackson v. Royal Caribbean Cruises, Ltd.,*
389 F.Supp.3d 431 (N.D. Tex.Feb. 26, 2019) .......... 5

*Klein v. Nabors Drilling U.S.A. L.P.*,
710 F.3d 234 (5th Cir. 2013) .......... 4

*May v. Expedia, Inc.,*
No. A-16-CV-1211-RP, 2018 U.S. Dist. LEXIS 167118 (W.D. Tex. July 19, 2018) .......... 8, 9

*Nguyen v. Barnes & Noble Inc.,*
763 F.3d 1171 (9th Cir. 2014) .......... 6, 7

*Office VP, LLC v. Ideal Health, Inc.*,
No. A-11-CV-741 LY, 2012 U.S. Dist. LEXIS 30473 (W.D. Tex. Mar. 6, 2012) .......... 10

*Phillips v. Neutron Holdings, Inc.,*
No. 3:18-CV-3382, 2019 WL 4861435 (N.D. Tex Oct. 2, 2019) .......... 7

*Quamina v. JustAnswer LLC*,
No. 22-cv-06051, 2024 WL 950157 (N.D. Cal. March 5, 2024)................................................ 8

*Quick Print of New Orleans, Inc. v Danka Off. Imaging Co.*,
No. 04-642004, US Dist. LEXIS 12182 (E.D. La. June 25, 2004)..............................................

*Quick Print of New Orleans, Inc. v. Danka Office Imaging Co.,*
No. 04-644, 2004 WL 1488656 (E.D. La. June 25, 2004)......................................................... 5

*Sarchi v. Uber Techs., Inc.,*
268 A.3d 258 (2022) .................................................................................................................. 8

*Southwest Airlines Co. v. BoardFirst, L.L.C.*,
No. 3: 06-CV-0891, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ......................................... 6

*U.S. Money Reserve, Inc. V. Kagan*,
No. A-18-CV-577-LY, 2019 WL 1313469 (W.D. Tex. Jan. 29, 2019) ..................................... 7

*Wholesale Gadget Parts, Inc. v. Global Cellular, Inc.*,
No. 17-CV-4, 2017 U.S. Dist. LEXIS 157097 (N.D. Okla. Sept. 26, 2017) ............................ 10

*Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*,
No. 3:20-CV-2541, 2021 WL 2651087 (N.D. Tex. June 28, 2021) ........................................... 8

## I. INTRODUCTION

Visionworks of America, Inc. ("Defendant") controls and operates Visionworks.com ("Website"). Those who visit the Website can browse for and buy prescription eye products, schedule eye examinations, and browse sensitive health-related articles. Defendant employs tracking tools, including Meta's Pixel (the "Pixel"), to intercept communications between the users and the Website. Visionworks then shares those intercepted communications, including personal health information ("PHI") of users, with Meta.

The number of people impacted by Defendant's use of the Pixel strengthens the need for class resolution – both injunctive and damages – as the most reasonable means of recourse for users of the Website. While simultaneously moving to dismiss Plaintiffs claims (*see* ECF 13), Defendant moved to compel mediation and arbitration (ECF 14, "MTC"). This opposition focuses on Defendant's failure to adequately present users with the terms it purports to contain a mediation clause[1] and how the obscured browsewrap presentment Visionworks relies on is unenforceable and inapplicable to the claims at issue.

The Website, over time, contained three different Terms of Use ("TOU" or "Terms") and two different Privacy Policies. MTC at 3. The terms and privacy policies, with relevant terms, are:

---

[1] The terms containing the arbitration provision Visionworks seeks to enforce are inapplicable to any of the Plaintiffs.

| Name | Date of Terms | Arbitration Clause | Mediation Clause | Type of Presentment | Applicability to Plaintiffs |
|---|---|---|---|---|---|
| January 2018 Terms of Use ("January 2018 Terms") | January 1, 2018-February 21, 2024 | No | Yes – *only as incorporated by reference from the January 2018 and March 2022 privacy policies* | ***Browsewrap*** at bottom of Website/Clickwrap since January 18, 2019 when creating an account users required to click a check-box (not required to click if proceeding as a guest or to schedule an appointment) | Plaintiff Sharma, Plaintiff Young, Plaintiff Stieve, Plaintiff Dean |
| February 2024 Terms of Use ("February 2024 Terms") | February 22, 2024 – March 7, 2024 | Yes | Yes – *only as incorporated by reference from the March 2022 privacy policy* | ***Browsewrap*** / Clickwrap only if users created an account. Click not required to proceed as a guest or to schedule an appointment | |
| March 2024 Terms of Use ("March 2024 Terms) | March 8, 2024-Present | Yes | Yes – *only as incorporated by reference from the March 2022 privacy policies* | ***Browsewrap*** / Clickwrap only if users created an account. Click not required to proceed as a guest or to schedule an appointment | |
| January 2018 Privacy Policy | January 1, 2018 – March 29, 2022 | No | Yes | ***Browsewrap*** | Plaintiff Sharma, Plaintiff Stieve, Plaintiff Dean |
| March 2022 Privacy Policy | March 30, 2022 – Present | No | Yes | ***Browsewrap*** | Plaintiff Young |

*Table 1*

All named Plaintiffs, as shown in Table 1, visited the Website while the January 2018 terms were purportedly contained in the hyperlink. To start, because the January 2018 Terms did not contain an arbitration clause, Plaintiffs cannot be bound to arbitrate. What's more, Defendant has failed to establish that Plaintiffs had actual or constructive knowledge of the TOU. Its presentment of the Website's TOU – buried at the bottom of web pages, in obscured font color and size – is inadequate. As such, Defendant has failed to meet its burden of establishing that any arbitration agreement or mediation agreement should be upheld. As such, the Motion to Compel Arbitration and Mediation ("MTC") should be denied.

## II. STATEMENT OF FACTS

Plaintiffs' claims stem from Defendant's use of the Pixel to share Plaintiffs' PHI with Meta. Plaintiffs visited Defendant's Website, where they were able to search for and buy prescription eye products, schedule eye exams, and browse sensitive health-related related articles. Compl. ¶ 1. Defendant employs tracking tools to send information relating to Plaintiffs' searches, purchases, appointment scheduling and overall activity on the Website to Meta. Compl. ¶¶ 3-5.

Generally, the presentment of the TOU on the Website has been consistent since January 2018. In order for users of the Website to see that there is a hyperlink leading to the TOU, they must scroll all the way to the bottom of the Webpage, past insurance options, eyeglass sales, and promotions, before reaching the hyperlinked TOU. The hyperlinked TOU appears in black, and in the same font as a myriad of other hyperlinks appearing at the bottom of the Webpage. MTC Ex. 7. The bottom of Defendant's Website also includes five lists of links under the headings: (1) Shop; (2) Help; (3) Learn; (4) Eye Health; and (5) About Us. These headings are in larger bolded font as compared to the words containing hyperlinks, which appear below these headings and further down the webpage. Also appearing at or near the bottom of the Website are logos for Facebook, Twitter, Instagram, and Pinterest. When those logos are clicked, users are brought to

the corresponding social media page. Below these logos are the words Sitemap, Privacy Policy, Notice of Privacy Practices, and Terms of Use. These words are in small black font, and only once a user places their cursor over the words do the words change color and become underlined to indicate that there is a hyperlink attached to the words. Only after finding the words "Terms of Use" and then hovering over the words to discover it is a hyperlink, can users click on that hyperlink to bring them to the TOU. Below the TOU, and unlike the understated presentment of the TOU hyperlink, is a statement in all caps, large, bolded font and navy and red in color, "ON A MISSION TO SIMPLIFY EYE CARE." This is also hyperlinked. Below that appears the words "Eye exams in some states are provided by independent doctors of optometry" – which is not hyperlinked, and appears in the same font color and size as the TOU above it.

The TOU provided within the hyperlink changed over time. As applicable to Plaintiffs, the January 2018 Terms did not contain an arbitration clause. *See Table 1.* Terms containing a mediation clause were ostensibly linked to the Webpage during Plaintiffs' visits to the Website, presented in browsewrap form, buried at the bottom of web pages in font color and size that is obscured by the other text and activity on the pages. *Id.*

## III. <u>LEGAL STANDARD</u>

A court may grant a motion to compel mediation or arbitration only when "the parties have previously entered into an arbitration or mediation agreement." *Highland Com. Constr., Inc. v. Educ. Mgmt., Inc.*, No. 23-543, 2023 WL 3601568, at *1 (E.D. La. May 23, 2023)(quoting *Brady v. St. John Baptist Par. Council*, No. 14–1613, 2014 WL 4540072, at *1 (E.D. La. Sept. 11, 2014)). When resolving a motion to compel arbitration, a court must first determine whether there is a valid agreement to arbitrate between the parties, and whether the dispute falls within the scope of the arbitration agreement. *Klein v. Nabors Drilling U.S.A. L.P.*, 710 F.3d 234, 236 (5th Cir. 2013).

"Arbitration is simply a matter of contract between the parties" and is determined by state contract law. *First Options of Chicago., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

In determining a motion to compel mediation, courts apply a similar standard as a motion to compel arbitration. "To determine if the parties in fact agreed to mediate, a court must determine (1) whether there is a valid [mediation] agreement between the parties; and (2) whether the dispute in question falls within the scope of the agreement." *Highland Com.,* 2023 WL 3601568, at *2 (*quoting Quick Print of New Orleans, Inc. v. Danka Office Imaging Co.,* No. 04-644, 2004 WL 1488656, at *2 (E.D. La. June 25, 2004)(*citing Fleetwood Enters. v. Gaskamp,* 280 F.3d 1069, 1072 (5th Cir. 2002)(noting that the two-step analysis applies to both a motion to compel mediation and arbitration)).

As the moving party, Defendant bears the burden of presenting evidence "sufficient to demonstrate an enforceable agreement to arbitrate." *Hammond v. United States Fire Ins. Co. (Del.)*, No. 4:22-CV-2004, 2023 WL 2142979, at *3 (S.D. Tex. Feb. 21, 2023). Once the initial burden of providing sufficient evidence to demonstrate that an enforceable agreement exists has been met, only then does "the burden shifts to the non-movant to raise a genuine dispute of material fact for trial." *Id. (citing Jackson v. Royal Caribbean Cruises, Ltd.,* 389 F.Supp.3d 431, 445 (N.D. Tex.Feb. 26, 2019)).

## IV. <u>ARGUMENT</u>

### A. There was No Assent to VisionWorks's Purported Terms

Defendant seeks to compel Plaintiffs to mediation and arbitration based upon an agreement that was allegedly entered into by the parties. The court should deny the MTC because Defendant fails to meet its burden of proving that any Plaintiff had actual or constructive knowledge of any agreement. While Congress' enactment of the Federal Arbitration Act ("FAA") is aimed at making arbitration agreements as enforceable as other contracts, it is not intended to be *more enforceable*

and does not extend beyond the agreement itself:

> Arbitration is strictly "a matter of consent," and thus "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." Applying this principle, our precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

Here, whether Plaintiffs agreed to arbitrate and/or mediate is contested. The dispute involves whether Plaintiffs had actual or constructive knowledge of the TOU. These facts are in question and serve as the basis for this Court to deny the MTC. Overall, Defendant has failed to establish the existence of a valid, enforceable agreement.

**B. The TOU is an Unenforceable Browsewrap Agreement**

The agreement at issue in this case is a browsewrap agreement. Browsewrap agreements are typically "found in the form of a notice that states that a condition for utilizing the website includes abiding by the website's terms and conditions, which may be found on that page or via a hyperlink." *DHI Grp. Inc. v. Kent*, No. H-16-1670, 2017 WL 8794877, at *4 (S.D. Tex. April 21, 2017). "The validity of a browsewrap license turns on whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site." *Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3: 06-CV-0891, 2007 WL 4823761, at *5 (N.D. Tex. Sept. 12, 2007) (finding there was actual knowledge of Southwest's terms where Southwest sent a cease and desist letter informing defendant of the terms).

Here, Plaintiffs did not have actual or constructive knowledge of the Website's TOU. Whether a user has notice of a browsewrap agreement "depends on the design and content of the website and the agreement's webpage." *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1177 (9th Cir. 2014). Defendant states in their MTC that the website Terms can be found only after scrolling

to the bottom of the Website's homepage and all sub-pages. MTC at 13. Additionally, there is no popup that appears on the first page of the Website informing visitors of any TOU. That, particularly when combined with the fact that there were a number of pop-ups appearing on the Website encouraging visitors to schedule an eye exam, minimizes any opportunity for users to view the terms, or know that they exist at all. Courts have denied enforcing browsewrap agreements where terms were provided only at the very bottom of a webpage with no pop-ups informing users of terms. *See U.S. Money Reserve, Inc. V. Kagan*, No. A-18-CV-577-LY, 2019 WL 1313469, at *4-5 (W.D. Tex. Jan. 29, 2019) (finding no actual or constructive knowledge of the website's user agreement where the link to the agreement was "provided only at the very bottom of the webpage and no information about the agreement pops up when the webpage is initially located"); *See also Nguyen,* 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement").

Additionally, the TOU hyperlink is not in a different font or color than the other hyperlinks located at the bottom of the Website's webpages. Courts, including in this District, found notice only where the hyperlinked TOU were in "dark, bold font, making them stand out from both the white screen and the surrounding gray text." *Phillips v. Neutron Holdings, Inc.,* No. 3:18-CV-3382, 2019 WL 4861435, at *5 (N.D. Tex Oct. 2, 2019); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-857 (9th Cir. April 5, 2022) (finding no notice where the hyperlink was displayed in tiny gray font, noting that "consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks'") (*quoting Nguyen,* 763 F.3d at 1179). Indeed, the facts in *Berman* are similar to the facts here in that in *Berman*, the hyperlink appeared in small gray font, "rather than in blue, the

color typically used to signify the presence of a hyperlink." *Berman,* 30 F.4th at 854. This Court should also find that Visionworks presentments of its TOU is equally unenforceable.

It is significant that the bottom of the Website's homepage is cluttered by hyperlinks and that the hyperlink to the TOU is black, blending in with the other hyperlinks surrounding it. There are also words below the hyperlinks that are in a bigger bolded font and red in color, drawing users of the Website away from the obscured TOU hyperlink. *See Sarchi v. Uber Techs., Inc.,* 268 A.3d 258, 267 (2022) (questioning the enforceability of terms "where notice or the hyperlink to agreement terms appears on an interface that is cluttered with other features and therefore is not easily spotted"); *see also Quamina v. JustAnswer LLC*, No. 22-cv-06051, 2024 WL 950157, at *6 (N.D. Cal. March 5, 2024) (finding no notice where a hyperlink appeared "in the smallest print anywhere on a cluttered page").

Further, Defendant argues that Plaintiffs had "multiple opportunities" to review the TOU because Plaintiffs visited the Website multiple times. MTC at 14. That Plaintiffs may have had the ability to review the TOU buried on the Website is insufficient to establish that there was actual or constructive notice of the TOU. The number of web pages that the Terms are buried in is also of no consequence, and the number of visits a user may have made to the site does not alter the actual or constructive notice analysis. *See Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*, No. 3:20-CV-2541, 2021 WL 2651087, at *5 (N.D. Tex. June 28, 2021) (quoting *Cvent, Inc. V. Eventbrite, Inc.*, 739 F.Supp.2d 927, 937 (E.D. Va. 2010) (noting that "simply alleging that the terms of use on the website are 'readily available for review' is insufficient to establish that there was actual or constructive knowledge").

Defendant's reliance on *May v. Expedia, Inc.,* No. A-16-CV-1211-RP, 2018 U.S. Dist. LEXIS 167118 (W.D. Tex. July 19, 2018) is misleading. *See* MTC at 14. To begin, the word browswrap does not appear in the decision. The court in *May* ruled there was notice because the

website "required the user to click a 'Continue' button to complete the transaction, and directly above the 'Continue' button informed the user that '[b]y clicking 'Continue' you are agreeing to our Terms and Conditions and Privacy Policy." *May,* 2018 U.S. Dist. LEXIS 167118 at *9. Additionally, the *May* court noted that the links to the agreements "were in blue, as opposed to black, font to indicate they were hyperlinks." *Id.* Here, Plaintiffs were not asked to click any button that informed them that by clicking such button they were agreeing to the TOU. Rather, there was no continue button at all for Plaintiffs to click to assent to the TOU. Also, the font at the bottom of Defendant's Webpage is in black, not blue, disguising that the words contained a hyperlink. *May,* 2018 U.S. Dist. LEXIS 167118 at *9.

As such, Plaintiffs did not have actual or constructive knowledge of any TOU and cannot be bound to any arbitration agreement or mediation agreement contained therein.

**C. Any Alleged Arbitration Agreement is Not Applicable to Named Plaintiffs**

By Defendant's own admission, the motion to compel arbitration is only applicable to "certain absent putative class members." MTC at 1. Indeed, the Defendant notes that the arbitration agreement was only added to the TOU on February 22, 2024. *See Table 1.* As such, those users – including all Plaintiffs here – who only used the Website prior to February 22, 2024 are not bound to arbitration. For Plaintiffs, the January 2018 Terms were located at the hyperlink at the bottom of the Website. *Id.* The January 2018 Terms did not contain an arbitration agreement. *Id.* As such, all named Plaintiffs are not bound to arbitrate because there was no arbitration agreement in the TOU during their use of the Website. At most, Visionworks's argument raises a question as to scope of the class members to be represented by the named Plaintiffs at class certification.

**D. The Mediation Agreement is Unenforceable**

As discussed above, Plaintiffs had no actual or constructive notice of the TOU. The alleged mediation clause was incorporated by reference within the TOU. As a browsewrap agreement,

Defendant was required to provide actual or constructive notice of the TOU. Defendant failed to do so, rendering any purported agreement to mediate as unenforceable.[2]

Defendant's reliance on *Wholesale Gadget Parts, Inc. v. Global Cellular, Inc*. fails in that the agreement at issue there was a physical contract. *See* MTC at 11 citing *Wholesale Gadget Parts, Inc. v. Global Cellular, Inc*., No. 17-CV-4, 2017 U.S. Dist. LEXIS 157097, at *1 (N.D. Okla. Sept. 26, 2017). In *Wholesale*, there was no question as to notice because the parties physically signed the contract. *Id.* at *2 (addressing a purchaser-seller agreement). Here, the notice of Visionworks's purported online contract is central to Defendant's MTC. Here, the online terms were not assented to by Plaintiffs. At most, the terms were *available* to users.

Defendant's reliance upon *Office VP, LLC v. Ideal Health, Inc.*, No. A-11-CV-741 LY, 2012 U.S. Dist. LEXIS 30473 (W.D. Tex. Mar. 6, 2012) is similarly misleading. *See* MTC at 10-11. Contrary to the present case, the contract at issue was a Hosting and Services Agreement which was a physical contract and not an online hyperlinked agreement. *Office VP*, 2012 U.S. Dist. LEXIS 30473 at *3. As such, notice was not an issue in *Office VP.* What's more*,* the plaintiffs in *Office VP* did not contest or object to the motion to compel mediation. *Id.* at *18. Ultimately, the court in *Office VP* stayed the litigation for a defined time period to allow for mediation to be conducted. It did not dismissal the claims. *Id.* at *19.

Defendant's reliance on *Quick Print of New Orleans, Inc. v Danka Off. Imaging Co.*, No. 04-644, 2004 US Dist. LEXIS 12182 (E.D. La. June 25, 2004) is similarly distinguishable. *See* MTC at 11. The agreement at issue in *Quick Print of New Orleans* was a signed business contract between two parties. *Quick Print*, 2004 U.S. Dist LEXIS 12182 at *2 ("Master Agreements

[2] Without conceding the enforcement or applicability of the mediation provision; rather, in the interest of pressing these privacy claims forward, counsel for Plaintiffs provided notice, on June 25, 2024, to initiate mediation proceedings on behalf of 254 additional Website users whose privacy was similarly violated through Visionworks's employment of the Pixel on its Website.

executed by the parties").[3] It was not an unsigned, online agreement.

Here, Plaintiffs are not bound to mediate. The provision calling for it was contained within a browsewrap agreement, which was inadequately presented. Unlike the cases cited by Defendant, Plaintiffs had no actual or constructive knowledge of the TOU and therefore cannot be bound to the mediation agreement contained within the TOU. Defendant has failed to meet its burden in showing that Plaintiffs had actual or constructive knowledge of any agreement to mediate. As such, Defendant's MTC should be denied.

**E. Defendant Failed to Meet Its Burden to Establish the Existence or Enforceability of a Clickwrap Agreement**

Defendant has not satisfied its burden of establishing that any clickwrap agreement existed, let alone that Plaintiffs assented to any such agreement. Defendant contends that to create a user account, account holders would have had to click a button assenting to the TOU. MTC at 13. Defendant makes no mention of the fact that visitors to the Website can proceed throughout checkout and schedule an eye exam as a guest, without ever having to create a user account or click on any button box to assent to the TOU. Defendant has not met its burden of establishing that Plaintiffs created user accounts. Defendant has not proffered any evidence that Plaintiffs actually clicked to assent to the TOU or opened accounts.[4]

---

[3] The court in *Quick Print* stayed the litigation so that the parties could engage in mediation. *Id.* at 9.

[4] At most, Defendant's claim that there was a clickwrap agreement narrows the scope of the class, in that users who created an account would be subject to arbitration. Defendant did not state whether *any* Plaintiff was subject to a clickwrap agreement.

Visionworks is capable of providing the Court and Plaintiffs with particular details as to which Website users, including Plaintiffs, assented to the TOU. Defendant is particularly capable of meeting its burden of establishing that Plaintiffs assented to the TOU because Defendant utilizes tracking tools on the Website which would allow it to confirm assent. As part of the work performed for Plaintiffs in support of this opposition memorandum, numerous tracking tools were identified as active and operating on Visionworks's website: (1) the Facebook Pixel;[5] (2) Google DoubleClick;[6](3) Google Analytics;[7](4) Quantum Metric;[8] (5) AdRoll Pixel;[9] (6) Pinterest Tag;[10] and (7) TrustArc.[11]

Visionworks's use of these tracking tools – in isolation, and certainly in conjunction with one another – enables Visionworks to know precisely which pages were visited by users who

---

[5] *See Meta for Developers: Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited July 2, 2024) (The Facebook Pixel is a snippet of code that websites can add to their own webpage code that, once loaded onto browsers, results in additional Facebook code being called by the webpage to monitor user activity and events. When implementing the Pixel, the website developer tells Facebook which website events ("Pixel Events") it wants to track (e.g., which items are clicked, which webpages are loaded, whether to capture and disclose the metadata tags added to the content on the webpage by website developers) and Facebook returns corresponding Facebook Pixel code for the website to track user activity on the webpage. The Facebook Pixel, and its associated Pixel Events can be used to track predefined or custom actions across a website).

[6] *See Third-Party Apps Conversion Tracking: The Doubleclick Digital Marketing Suite*, GOOGLE, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last visited July 2, 2024) (Utilizing DoubleClick tracking tools across its website allows websites to track the performance of ads and provides data such as impressions, clicks, and conversions to the advertiser across their website. DoubleClick allows users to configure a separate tracking activity for each event they would like to track. This includes installs or in-app events).

[7] *See Analytics Help: How Google Analytics works*, GOOGLE, https://support.google.com/analytics/answer/12159447?hl=en_ (last visited July 2, 2024) (Google Analytics tracking code allows websites to collect information about how that user interacted with the page. The measurement code will also collect information from the browser like the language setting, the type of browser (such as Chrome or Safari), and the device and operating system on which the browser is running. It can even collect the "traffic source," which is what brought users to the site in the first place).

purchased prescription eye products, scheduled appointments, or accessed health information related webpages and whether any actual terms were presented to these users. What's more, these tools provide the means for Visionworks to know who, if anyone, actually assented to its TOU. Depending on how Visionworks employed the tracking tools at its disposal, as specifically set and programed by Visionworks, Defendant has the ability to confirm that each visitor: (i) clicked to read the TOU; (ii) scrolled to, or over, the link to the TOU on a visited screen; or (iii) how long the purchaser spent reading it.

Defendant's clear capability of providing evidence, and failure to do so, only adds to Defendant's failure to meet the burden of proof for its MTC.[12]

---

[8] Quantum metrics, using simple JavaScript tag or DDK deployment metrics, "combines the power of real-time analytics and monitoring, and session replay to give business and technical teams a 360-view of how customers experience your digital products. We do this by capturing behavioral, technical, and business-level data across both web and native applications, from clicks, taps, scrolls, and rage clicks to 404 errors, and long-running spinners." *Product Details: Quantum Metric*, GOOGLE CLOUD, https://console.cloud.google.com/marketplace/product/quantum-metric-llc-public/quantum-metric (last visited July 2, 2024).

[9] The AdRoll Pixel can be placed on every page within a website to track site activity, including conversions. AdRoll can track various actions such as clicking a certain button within the website, or other custom events set by the website. *Help Center: Track Conversions*, ADROLL, https://help.adroll.com/hc/en-us/articles/212628728-Track-Conversions (last visited July 2, 2024).

[10] "The Pinterest tag is a piece of code that you add to your website. It lets Pinterest track visitors to your site, as well as the actions they take on your site after seeing your Pinterest ad." The Pinterest tag allows websites to track and optimize conversions and measure campaign performance on websites. *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited July 2, 2024).

[11] TrustArc website monitoring uses cookies and other tracking technologies that enable companies to provide an enhanced online experience for website visitors. TrustArc allows websiites to schedule deep website scans, including subpages and behind login pages, to detect other tracers impact on website performance. *Website Monitoring Manager*, TRUSTARC, https://trustarc.com/products/consent-consumer-rights/website-monitoring-manager/ (last visited July 2, 2024).

[12] At a minimum, Plaintiffs are entitled to discovery of such information held by Defendant.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in its entirety. In the alternative, Plaintiffs respectfully request leave to amend the complaint.[13]

Dated: July 8, 2024

**FOSTER YARBOROUGH**

By: */s/ Patrick Yarborough*
Patrick Yarborough
Jeffrey Lucas Ott
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
Email: patrick@fosteryarborough.com
Email: luke@fosteryarborough.com

Mark S. Reich*
Courtney Maccarone*
Gary I. Ishimoto**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming
***admitted pro hac vice on June 20, 2024*

[13] If given the opportunity to amend their Complaint, Plaintiffs could plead additional facts relating to Plaintiffs' use of the Website and the tracking tools enabled on the Website.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 8, 2024.

By: */s/ Patrick Yarborough*
Patrick Yarborough